# B. S. BROOKS *v.* MICHAEL HYDE *et als.*

DEDICATION OT LAND TO HOMESTEAD PURPOSES.—The party in possession of land by a dedication of the same to homestead use does not acquire any title which he did not before possess, and if he is in possession wrongfully, he does not acquire thereby any defense against the claim of the true owner; but as against the creditors of such party, such dedication to homestead purposes protects the land as much as though he was vested with the fee simple title.

HOMESTEAD.—In questions arising between homestead claimants and those claiming under or against them as creditors, the question as to whether the homestead claimant has or has not title is immaterial.

TITLE BY VAN NESS ORDINANCE.—If, on the first day of January, 1855, a person

was in possession of land in San Francisco, within the limits of the Van Ness Ordinance, as the tenant of another, or, as against such person, an intruder who could have been evicted by legal process, the person thus in possession did not acquire title by the Van Ness Ordinance, but the title vested in the landlord or the person who could have recovered possession.

DEED OF HOMESTEAD.—A deed of a homestead, executed by the husband alone, gives no right of entry to the grantee, so long as the grantor continues to occupy the premises as a homestead.

GRANTOR WHO REMAINS IN POSSESSION.—Where a person in possession of land conveys to another, and thereafter remains in possession, he does so as the tenant at will of the grantee. The conventional relation of landlord and tenant does not, however, exist between the grantor and grantee. The grantor holds in sub-serviency to the grantee, who may recover possession at any time.

WORD "TENANT" IN VAN NESS ORDINANCE.—The Court are inclined to consider the word "tenant," as used in the Van Ness Ordinance, as meaning a conventional tenant.

EFFECT OF DEED OF HOMESTEAD BY HUSBAND.—If a deed of the homestead is executed by the husband alone, and he remains thereafter in possession, he does not become either the tenant at will or the conventional tenant of the grantee.

TITLE UNDER THE VAN NESS ORDINANCE.—If a quitclaim deed of a homestead within the limits of the Van Ness Ordinance, in San Francisco, was made before January 1st, 1855, by the husband alone, and he remained in possession until after said date, the title to the land by virtue of said ordinance vested in the grantor.

CONSTITUTIONAL QUESTION.—The Act of March, 1864, (Stats. 1863-4, p. 149,) in relation to limitations of actions for the recovery of real estate in the City and County of San Francisco, is not unconstitutional.

SECTION ELEVEN OF ARTICLE I OF CONSTITUTION.—The eleventh section of Article I of the Constitution, which provides that "all laws of a general nature shall have a uniform operation," means that every law shall have a uniform operation upon all the citizens or persons or things of any class upon which it purports to take effect, and that it shall not grant to any citizen or class of citizens privileges which, upon the same terms, shall not equally belong to all citizens.

APPEAL from the District Court, Fifteenth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*Porter & Holladay,* and *T. B. Bishop,* for Appellant.

The deed from Baxter to Harris was a mere quitclaim, without any covenant of warranty, and only conveyed to the grantee such estate as the grantor had then the ability to convey, which was nothing. A title subsequently acquired by the grantor would not inure to the benefit of the grantee,

nor would the grantor be estopped by its terms from subsequently acquiring and maintaining title in himself. (*Gee* v. *Moore*, 14 Cal. 473; *Clark* v. *Baker*, 14 Cal. 627; *McCracken* v. *Wright*, 14 Johns. 193.)

Baxter, having been in the actual possession during the whole of the year 1854, and down to the 20th day of June, 1855, and long afterwards, acquired a title to the land in fee simple, by virtue of his possession, under the Van Ness Ordinance.

*B. S. Brooks*, for Respondent.

If Baxter had no title, legal or equitable, there was no homestead right. It is conceded that Baxter had the actual possession at the time he made the deed. The effect of the deed was to make Baxter the tenant of Harris. (*Burhaus* v. *Van Zandt*, 7 Barb. 91; *Carver* v. *Earl*, 1 Shepl. 216; *Millay* v. *Millay*, 6 Shepl. 387; *Jackson* v. *Burton*, 1 Wend. 341; *Zeller's Lessee* v. *Eckert*, 4 How. U. S. 289; and *Hyatt* v. *Wood*, 4 Johns. 156.)

Nothing but a clear and notorious disclaimer of title of Baxter's grantee could render his possession, however long continued, adverse. (3 Caine, 189; 1 Peters, 570; 1 Johns., Cases, 153; 4 Cow. 576; 3 Mass. 128; and 2 Green, 1.) A sale of the homestead by the husband alone vests the estate in the vendee, subject only to the use and occupation of the husband and wife until another homestead is acquired, or until the character of the premises as a homestead is otherwise gone. (*Gee* v. *Moore*, 14 Cal. 472.)

Under the deed of Baxter to Harris, the latter had no right to the possession of the land while it continued to be the homestead of Baxter. His conveyance to Hyde by deed of himself and wife, duly acknowledged, divested the land of its homestead character, and gave to Harris a right of entry. While the homestead character continued, there could be no adverse possession. In other words, until Harris had a right of entry there could be no possession adverse to him. (*Zeller's Lessee* v. *Eckart*, 4 How. U. S. 295.)

By the Court, SANDERSON, J. :

This is an action of ejectment. The defenses, so far as we shall have occasion to consider them, are : denial of plaintiff's title, title in defendants, and the local limitation Act of the 5th of March, 1864, in relation to actions for the recovery of lands in the City and County of San Francisco. Judgment passed for the plaintiff in the Court below. Thereupon the defendant moved for a new trial, which was denied.

It appeared at the trial, by the mutual agreement of counsel, that the premises in question are situated within the limits of the land which was confirmed to the City of San Francisco by the Circuit Court of the United States as pueblo land, and within the lines of the Van Ness Ordinance. It was then proved on the part of the plaintiff that during the year 1854, and up to the passage of the Van Ness Ordinance in June, 1855, one Baxter and his family, consisting of a wife and three children, were in the actual possession and residing upon the premises. That in October, 1854, Baxter deeded to one Harris in the following words : "Know all men by these presents, that I, John Baxter, of San Francisco, in consideration of the sum of five hundred and fifty dollars to me in hand paid by Thomas Harris, the receipt whereof is hereby acknowledged, have bargained, sold, and quitclaimed, and by these presents do bargain, sell, and quitclaim unto the said Thomas Harris, and to his heirs and assigns forever, all my right, title, interest, estate, claim, and demand, both in law and equity, as well in possession as in expectancy, of, in, and to all that certain," etc. The deed was properly acknowledged, and was recorded two days after its execution.

Defendants objected to the admission of the deed upon the ground that the land appeared to have been homestead, and the deed was not executed by the wife of Baxter. The Court overruled the objection, the defendants excepting.

Plaintiff then introduced a quitclaim deed from Harris to himself, dated in March, 1867.

It was then agreed between counsel that the defendants were in possession at the time the action was brought, the defendant Hyde under a deed of grant, bargain and sale from Baxter and wife, which was valid in form, execution, and acknowledgment, dated in May, 1861, and the other defendants under Hyde. Here the plaintiff rested after proving the monthly value of the premises.

Thereupon the defendants introduced the deed from Baxter and wife to Hyde already mentioned, and then proved by Hyde that at the date thereof and prior thereto Baxter, wife, and children were residing upon the premises, and that they then surrendered to him, and he and the other defendants have held the premises ever since, claiming them in their own right.

Defendants then offered to prove by Hyde that before purchasing he caused the records of the Recorder's office to be examined by an attorney at law, who advised him that the title was good; that he paid one thousand five hundred dollars in coin for the land, and bought without any knowledge, in fact, of the deed of 1854 to Harris. The Court ruled that this testimony was inadmissible, the defendants excepting.

Defendants then offered to prove by Baxter that the consideration for the deed to Harris was never paid, but, on the contrary, Harris, within two months after the deed was executed, refused to pay, and that he (Baxter) from that time, until he sold to Hyde in 1861, had held possession, not as tenant of Harris, but in his own right, and adversely to Harris, and in defiance of him and all others. Which testimony was, also, held inadmissible by the Court, defendants excepting.

In conclusion, the defendants read the statute of March 5th, 1864, (Stats. 1863–4, p. 149,) which is as follows:

" SECTION 1. In any action which shall be commenced more than one year after this Act takes effect for the recovery of real property situated in the City and County of San Fran-

cisco, or for the recovery of the possession thereof, or in which the title to such real property shall be tried or affected, none of the provisions of the Act entitled ' An Act concerning the City of San Francisco, and to ratify and confirm certain ordinances of the Common Council of said city,' passed March 11th, 1858, and none of the provisions of either of the orders or ordinances therein recited or referred to shall be deemed, construed, or have effect to give, confirm, or otherwise aid the right or title set up or claimed by any party, unless such party, his ancestor, predecessor, or grantor shall have had actual possession of the land in dispute within five years next before the commencement of such action, the time already elapsed when this Act takes effect to be included in the computation.

"Sec. 2. The provisions of this Act shall not have the effect to prolong the time now prescribed by law for the commencement of any action referred to in the preceding section."

The defendants then asked the Court to charge the jury in effect that the Van Ness Ordinance vested the title in Baxter, and that he was not estopped from asserting the title so vested by his previous deed to Harris; also that the plaintiff's right of entry was barred by the statute which has been quoted. The Court declined to so instruct, and instructed to the effect that after the deed to Harris, Baxter held in subordination to Harris, and that by reason of the deed, the title conveyed by the Van Ness Ordinance inured to the benefit of Harris, notwithstanding Baxter may have been then holding adversely to Harris; and that the statute of March, 1864, was unconstitutional, and could have no effect in bar of the action.

Counsel for the appellants assume that according to the case made by the record, Baxter was in possession without title on the 17th of October, 1854—the time at which he conveyed to Harris, or, in other words, that the title was then in the City of San Francisco. Counsel for the respondent, how-

ever, excepts to this assumption, and claims that it has no warrant; that it does not follow that Baxter had no title from the fact that the land was a part of the pueblo land of the city, or within the lines of the Van Ness Ordinance, because he may have acquired the title by grant from an Alcalde or other officer, and there is nothing in the record to show that he had not. If the question be of moment, we are disposed to adopt the view of counsel for the appellants. For the purpose of narrowing the field of evidence, counsel agreed at the commencement of the trial that the premises constituted a part of the pueblo lands and were within the limits of the Van Ness Ordinance. This agreement could have had no significance in any other view than that Baxter's title depended upon those circumstances, or in other words, that he had no title except such as came to him by operation of the Van Ness Ordinance and its confirmation by the Legislature. The question was as to which had succeeded to Baxter's interest, and they agreed that Baxter was the common source of title and that he derived his title through the Van Ness Ordinance. It is furthermore evident from the instructions which were refused and given by the Court that such was the theory upon which the case was tried. Such is the theory, therefore, which we shall adopt for the purposes of our decision.

The first question is as to the relation of Baxter to the land when he conveyed to Harris in October, 1854. The case shows that he was residing upon the premises with his wife and children. Under the Homestead Law, as it then existed, that was *prima facie* sufficient to impress upon the premises the character of homestead. (*Moss* v. *Warner*, 10 Cal. 296.) Actual residence was then *prima facie* evidence of an intent to dedicate the premises to the uses and purposes of a homestead, open, however, to rebuttal by facts and circumstances *aliunde*. (*Holden* v. *Pinney*, 6 Cal. 234.) Against this it is said, however, that if they had no title they were mere trespassers, and could, therefore, acquire no right of homestead in the land; citing *Calderwood* v. *Tevis,*

23 Cal. 335.   Without going into a review of that case, it is sufficient to say that the question was as to the validity of a judgment in ejectment for the recovery of the homestead of the defendant, where the wife had not been made a party. The Court said that the wife was not a necessary party, if the defendants were mere trespassers.    But, be that as it may, we know of no reason why parties, otherwise entitled to the benefits of the Homestead Law, wrongfully in possession, may not shelter the possession under the provisions of the Homestead Act.   By a dedication to homestead use they, of course, acquire no title to the land which they did not have before, and no additional protection against the claims of the true owner; but, as against their creditors, the possession of the land is as much protected by the Homestead Law as if they were vested with the fee simple.    In the solution of all questions arising between homestead claimants and those claiming under or against them as creditors, the absence of title is a false quantity, which must be excluded from consideration.    The case, therefore, shows *prima facie* that Baxter and family were occupying the premises as a homestead in October, 1854, at the date of his deed to Harris.    Such being the conditions, in which did the title vest, in June, 1855, by operation of the Van Ness Ordinance?

The Van Ness Ordinance vested the title in the parties who were "in the actual possession on the 1st day of January, 1855, by themselves or tenants; provided, such possession had continued up to the introduction of the ordinance in the Common Council; or if interrupted by an intruder or trespasser, had been or could be recovered by legal process."   If the land was occupied under a lease or demise, it was expressly declared that it should be deemed to have been in the possession of the landlord or lessor.   (Stats. 1858, p. 52.)

If, on the 1st day of January, 1855, Baxter was the tenant of Harris, or, as against Harris, an intruder, whom Harris could have evicted by legal process, the title did not come to him.   He was not an intruder or trespasser—at least not one

whom Harris could have evicted by legal process; for so long as Baxter continued to occupy the premises as a homestead, Harris acquired no right of entry by his deed. (*Gee v. Moore*, 14 Cal. 472.)

Was Baxter the tenant of Harris on the 1st of January, 1855, within the meaning of the Van Ness Ordinance? There is no doubt as to the general proposition that, ordinarily, where a party in possession conveys to another, and thereafter remains in possession, he does so in a general sense as the tenant of his grantee. (*Zeller's Lessee* v. *Eckert*, 4 How. U. S. 289; *Burhaus* v. *Van Zandt*, 7 Barb. 91; *Jackson* v. *Harsen*, 7 Cow. 323; *Jackson* v. *Burton*, 1 Wend. 341; *Currier* v. *Earl*, 13 Maine, 216.) Under such conditions the law declares the grantor the tenant at will of the grantee, and he may be ejected at any time. The conventional relation of landlord and tenant, however, does not exist between them. They become such merely by operation of law, and the meaning is that the grantor thereafter holds in subserviency to his grantee. We are inclined to consider the word "tenant," as used in the Van Ness Ordinance, as meaning a *conventional* tenant. If we give it a broader signification, as including every person in possession whom some one else can eject by legal process, we either strip it of all signification in the place where it is used, or we do the like in relation to the residue of the ordinance, which declares the intent and meaning to be that where the land is occupied under a *lease* or *demise* they shall be deemed to have been in the possession of the *landlord* or *lessor*, which language points only to a *conventional* tenancy. But the exigencies of this case do not force us to a final conclusion upon the question, for, in view of Baxter's homestead right, he could not have become, what without it he might have become, a tenant at will, by his deed to Harris. For the same reason that he was not an intruder, whom Harris could eject by legal process, he was not a tenant at will. His homestead right precluded his being either. Baxter being, then, neither a tenant at will, much less a tenant by convention, nor an

intruder whom Harris could eject by legal process, it is clear that title did not come to Harris by the Van Ness Ordinance, for he was within neither of its conditions, whatever else may have been his relation to the land. The title under the ordinance, therefore, vested in Baxter, and it did not inure to Harris by reason of the deed from the former to the latter, for it did not purport to convey the land in fee simple absolute.

This view disposes of the appeal; but it may be important for the purposes of another trial that the question of the constitutionality of the Act of the 5th of March, 1864, should also be determined. We therefore proceed to the consideration of that question.

It is unnecessary to refer to the rules by which the validity of a statute under the Constitution is to be determined. They will be found to have been very elaborately considered in both of the opinions which were delivered in the case of *Bourland* v. *Hildreth*, 26 Cal. 162. If, after a thorough examination, the Court entertains rational doubts, the statute must be held valid.

The only provision of the Constitution to which this Act is claimed to be repugnant, is the eleventh section of the First Article, which provides that "all laws of a general nature shall have a uniform operation."

In the case of *Bourland* v. *Hildreth, supra,* it was claimed that the Act then before the Court was repugnant to this clause of the Constitution as well as to that which deals with the right of suffrage. A majority of the Court came to the conclusion that the Act was repugnant to the latter clause, and therefore found it unnecessary to consider its relation to the former. I came to a different conclusion, and was therefore called upon to construe the former clause also. After pointing out its intrinsic obscurity, I said: "The meaning of the predicate, however, is clear, for, by a 'uniform operation,' I understand, as was said in *French* v. *Teschemaker.* 24 Cal. 544, an operation which is equal in its effect upon all persons or things upon which the law is designed to operate

at all. The difficulty is in determining the precise definition
of a general law. All laws operate upon persons or things.
Are we, then, to understand that a general law is only one
which operates upon all persons or upon all things? If so,
it is obvious that our general laws are very few, if, indeed,
there are any of that class. Obviously such cannot be the
meaning of the words 'of a general nature,' as here used.
The word 'general' comes from *genus*, and relates to a
whole *genus*, or kind, or, in other words, to a whole class or
order. Hence a law which affects a class of persons or things
less than all, may be a general law. If so, the California
Volunteers in the military service of the United States on
the 15th day of July, 1863, may be regarded as a class, and
the Act in question a general law. In that case it is not
obnoxious to constitutional objection on the ground under
consideration, for it is not denied but that it operates uni-
formly upon all persons upon whom it was intended to
operate at all.

"This view is much the same as that taken by Mr. Justice
BALDWIN in *Smith* v. *The Judge of the Twelfth Judicial Dis-
trict*, 17 Cal. 554, in which case he had occasion to construe
this provision of our Constitution. He there said: 'The
language must be carefully noted. It is not that laws shall
be universal or general in their application to the same sub-
ject, nor is it even that all '"laws of a general nature"' shall
be universal or general in their application to such subjects;
but the expression is that these laws '"of a general nature"'
shall be '"uniform in their operation,"' that is, that such
laws shall bear equally in their burdens and benefits upon
persons standing in the same category.'

"Whatever of difficulty there may be in comprehending,
when by itself considered, the precise office which this clause
of our Constitution was designed to perform, it is removed
when we read it in connection with the context of the Con-
stitution, from which it was manifestly borrowed.

"As a matter of history, it is well known that our Consti-
tution is in many respects copied from that of Iowa. Upon

motion of Mr. Gwin, the Constitution of Iowa was adopted by
the Constitutional Convention as a basis for ours, for the
reason, as stated by him, that it was one of the latest and
shortest.   (Debates of Convention, p. 24.)   The first article
was reported by a committee of which Mr. Norton was chair-
man, and, as first reported, consisted of sixteen sections,
including the one in question, bearing the same number
which it now has.   Speaking of the report, Mr. Gwin said
the first eight sections were from the Constitution of New
York, and all the others were from the Constitution of Iowa.
(Debates of Convention, 31.)   So far as it goes, section eleven
is a *verbatim* copy of section six of Article I of the Iowa Con-
stitution, with the most important part left out.   The latter
section reads as follows:

  " 'SECTION 6.  All laws of a general nature shall have a
uniform operation; the General Assembly shall not grant to
any citizen or class of citizens privileges or immunities
which, upon the same terms, shall not equally belong to all
citizens.'

  "Here the meaning of the first clause of the sentence,
which, by reason of the 'glittering generality' of the lan-
guage, when by itself considered, is obscure if not unintel-
ligible, is explained and made clear by the latter clause, which
serves as a definition to the first.   The first clause is the
shell, and the latter is the meat; and it is a little surprising
that our Constitutional Convention, if unwilling to take
both, should choose the former.   Viewed through the
medium of the latter clause, the meaning of the first is
made so obvious that they may not have detected its intrin-
sic obscurity, and with a view to brevity, may have con-
cluded to take the rule without its definition.   However that
may be, the meaning of the clause, as used in the Iowa Con-
stitution, is obvious, and we must presume that when our
Constitutional Convention borrrowed the language they also

CAL. REPS. XXXVII—48

borrowed the meaning, and designed that it should establish the same rule of legislative action which, by express definition, it is made to establish in the Constitution from which it is taken.

"I am, therefore, of the opinion that the true intent and meaning of section eleven of Article First of our Constitution is to the effect that the Legislature shall not grant to any citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens. Thus interpreted, it affords a reasonoble and salutary restriction upon legislative power, and, in my judgment, any other reading would render it meaningless and absurd.

"Thus read, it is obvious that the rule which it establishes has not been contravened by the Act of 1863, enabling California Volunteers to vote outside of the counties of their residence, either within or without the State. The only privilege conferred by the Act is the privilege of voting outside of the county or district or State of the voter's residence. The terms and conditions upon which this privilege is conferred and may be enjoyed are, that the voter, on the 15th day of July, 1863, shall be in the military service of the United States, and thereafter, on election day, and by the exigencies of that service absent on election day from the county of his residence. As to them, the law is general, and makes no distinction between individuals, but operates uniformly upon all. And it did not confer upon them any privileges or immunities which might not have equally belonged, upon the same terms, to all citizens."

If, on the other hand, by "laws of a general nature" were intended such laws as are not *local or special* in their operation, that is to say, such laws as are not restricted in their operation to given localities and cases, it is obvious that the statute in question is wholly beyond the purview of this provision of the Constitution. The statute establishes a limitation upon actions for the recovery of lands in the City and County of San Francisco, and actions ·affecting the title to lands therein, where the plaintiff relies upon the Van Ness Ordi-

nance or the title to be affected comes from the Van Ness Ordinance. It is, therefore, under the view we are now taking, both local and special—local because confined in its operation to the City and County of San Francisco, and special because confined to a certain class of titles. There is nothing in the Constitution which prohibits the Legislature from passing either local or special laws, except in respect to the formation of corporations other than for municipal purposes. (Art. IV, Sec. 31.) Such a provision would have been in many respects prejudicial to the local wants of the people, and would have placed it beyond the power of the Legislature to meet and provide for such unforeseen conditions as are sure to arise. It would have led to all manner of mischief, and would have so hampered the Legislature as to have precluded the passage of indispensable laws, or to have made necessary their extension, merely for the sake of form, to localities and cases where they could have had no beneficial operation. It would have prevented the Legislature from excepting certain localities and cases from the operation of general laws, which, although beneficial in the main, might prove as injurious to them. Under its operation, no distinction could have been made between counties and cities in respect to the various subjects of legislation, such as taxes, licenses, highways, fees of office, and the like, notwithstanding the fact, obvious to every one, that no general rule in respect to such matters could be adopted, in the nature of things, which would equally subserve its purpose in every county or city in the State. (*Smith v. The Judge of the Twelfth District,* 17 Cal. 552.)

To hold that the statute in qestion is unconstitutional because it is local and special, would be to declare two thirds of the legislation of this State null and void, and to overturn titles by which large amounts of property have passed; to set aside all sales of estates of deceased persons and of wards, which have been made under special laws; and, in short, to open up for litigation all titles to which the general law in relation to the limitation of actions for the recovery

of lands has given repose. For, if the statute before us is unconstitutional because it deals with a particular class of titles, and prescribes as to them a limitation which is not adopted in respect to other titles, then for the same reason the general Statute of Limitations, in respect to actions for the recovery of lands, is also unconstitutional; for it establishes one period of limitation for actions founded upon Spanish or Mexican titles, and another for actions founded upon titles which do not belong to that class. So of the one hundred and ninetieth section of the Probate Act, which establishes a special limitation for actions for the recovery of lands which have been sold as in that Act provided, which varies materially from the period which has been adopted in other cases. In view of such disastrous consequences this Court, were it in doubt, would hesitate long before it would declare the statute in question repugnant to the Constitution.

Our conclusion is that the statute, if a general law within the meaning of Article I, section eleven of the Constitution, has a uniform operation within the meaning of that section; and that if it is not a general law, but a local and special law, it is wholly without the purview of that section, and is not repugnant to any other provision of the Constitution.

Judgment and order reversed, and a new trial granted.


RHODES, J., concurring specially

I concur in the judgment and also in the opinion, except as to the construction given to section eleven, Article I, of the Constitution.

CROCKETT, J., concurring specially.

The constitutional question discussed in the opinion of Mr. Justice SANDERSON is not necessarily involved in the decision of the present appeal. I concur in the judgment and in the remainder of the opinion, but express no opinion on the constitutional question.